# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 50234 | **DATE** | 5/20/2004 |
| **CASE TITLE** | Lomelino vs. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____. Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐  Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10)  ■  [Other docket entry]  For the reasons stated on the attached Memorandum Opinion and Order, Plaintiff's Motion for Summary Judgment is granted in part and denied in part. By agreement of both parties, Plaintiff's second claim is remanded. With regards to Plaintiff's first claim, the ALJ's decision to deny benefits to Plaintiff is sustained and the ALJ is affirmed at all steps of the disability determination process. Defendant's Motion for Summary Judgment is granted in part and denied in part.

(11)  ■  [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | | 5-21-04 | 25 |
| | Docketing to mail notices. | | | date docketed | |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | 5/20/2004 | |
| | | | | date mailed notice | |
| sp | courtroom deputy's initials | | Date/time received in central Clerk's Office | sp mailing deputy initials | |

DONNA R. LOMELINO,        )
                               )
     Plaintiff,              )        Case No. 03 C 50234
                               )
     v.                  )        Magistrate Judge
                               )        P. Michael Mahoney
JO ANNE B. BARNHART,       )
COMMISSIONER OF SOCIAL    )
SECURITY,                 )
                               )
     Defendant.           )

## MEMORANDUM OPINION AND ORDER

Donna Lomelino ("Plaintiff") seeks judicial review of the final decision of the Commissioner

of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The

Commissioner's final decision denied both Plaintiff's applications for Disability Insurance Benefits

("DIB") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. §1381(a). This

matter is before the Magistrate Judge pursuant to consents filed by both parties on September 11,

2003. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I.    BACKGROUND

Plaintiff filed her first application for DIB on July 26, 2000, alleging disability on December

14, 1999. (Tr. 63). Plaintiff's first application for benefits was denied on October 21, 2000. (Tr.

25). On December 8, 2000, Plaintiff filed a request for reconsideration. (Tr. 29). Plaintiff's request

for reconsideration was denied on February 13, 2001. (Tr. 31). Plaintiff then filed a request for a

hearing before an Administrative Law Judge ("ALJ") on March 7, 2001. (Tr. 34). Plaintiff

appeared, with counsel, before an ALJ on December 12, 2001. (Tr. 364). In a decision dated May

30, 2001, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 20).

On June 28, 2002, Plaintiff filed a second application for DIB, alleging disability on December 24, 1999. (Pl.'s Mot. to Supp. or Remand at 1). This application was denied initially and upon reconsideration. On July 30, 2002, Plaintiff requested a review by the Appeals Council of the ALJ's decision of her first application. (Tr. 9). On November 28, 2002, an ALJ, not the same ALJ as Plaintiff's first application, dismissed Plaintiff's request for a hearing based on the doctrine of *res judicata* finding that the same facts or issues were present in the second application that had been adjudicated in the first. (Pl.'s Mot. to Supp. or Remand at 1). On April 3, 2003, the Appeals Council denied Plaintiff's request for review of both her applications. (Tr. 7).

Plaintiff's compliant, filed in this court, contained two counts: Count I pertained to the first application; and Count II pertained to the second application. Plaintiff's motion before this court seeks a remand of both applications to be heard by an ALJ. (Mot. To Supp. or Remand at 3). In its response brief, the Defendant agrees with Plaintiff that the second DIB claim should be remanded. (Def.'s Resp. at 2). As such, this court orders Plaintiff's second DIB claim be remanded. This opinion thus deals only with Plaintiff's first DIB claim.

## II.    **FACTS**

Plaintiff was born on March 8, 1950 and was fify-one at the time of her December 12, 2001 hearing. (Tr. 371). Plaintiff graduated from the eighth grade. Plaintiff did not graduate from high school or receive her GED. Plaintiff testified she reads at a third grade level. (Tr. 373). At the time of her hearing, Plaintiff was living with her husband in a four bedroom ranch in Davis Junction, Illinois. (Tr. 369). Plaintiff suffers from a rotator cuff tear in her left shoulder (non-dominant arm), anxiety, depression, and hearing loss. It is for these reasons, and some others, that Plaintiff claims to be disabled.

Plaintiff's most recent employment was with Wal-Mart. Plaintiff testified that from December 1998 to December 1999 she was a salesperson/clerk in the jewelry department. (Tr. 375). This job was full time and occasionally required overtime work. As a salesperson/clerk in Wal-Mart's jewelry department, Plaintiff testified she was on her feet all day and could only sit during breaks. Additionally, Plaintiff was required to lift boxes full of jewelry from the warehouse and bring them to the jewelry department. (Tr. 376). These boxes, which Plaintiff testified she lifted herself, weighed up to fifty pounds. (*Id.*). Plaintiff's job at Wal-Mart also required her to bend so that she could stock jewelry in the display counters. It was while Plaintiff was bending to stock jewelry in one of the glass display counters that she hurt her shoulder. Specially, Plaintiff testified that she was standing up when she hit her shoulder on the corner of a glass shelf. (Tr. 377). As a result, Plaintiff needed shoulder surgery in April 2000. (Tr. 378).

Prior to Wal-Mart, Plaintiff worked at Ramada Suites. (*Id.*). At Ramada Suites, Plaintiff was a hostess. (Tr. 379). Her duties included getting to the hotel early to make coffee and serving donuts and rolls for the hotel patrons. (*Id.*). Additionally, Plaintiff was responsible for stocking meeting rooms in the hotel with coffee, donuts, and rolls. (*Id.*). Usually Plaintiff would just push the items on a cart from meeting room to meeting room. Plaintiff's job did not require her to set up tables and chairs or do a great deal of lifting and overhead reaching. (Tr. 379-380).

Prior to Ramada Suites, Plaintiff worked at Amcore Bank in the kitchen. (Tr. 381). Plaintiff mixed ingredients for desserts. (*Id.*). The job at Amcore Bank required no heavy lifting but did require her to be on her feet all day. (*Id.*). The job did require some bending as some ingredients were located in freezers or drawers below the counters. (*Id.*).

Before Amcore Bank, Plaintiff worked for Union Special in their factory. (*Id.*). At Union

Special, Plaintiff was an inspector and a sandblaster. (Tr. 382). Plaintiff's job required her to put parts ("not big parts but small parts maybe weighed five, ten pounds") on a sewing machine. (*Id.*). Plaintiff would then sit and inspect the parts after they were done. (*Id.*). Plaintiff testified that this process was lengthy and often she was able to only run one part at a time. (*Id.*).

From 1986 to 1998, Plaintiff worked for Reco Plastics. (Tr. 383). At Reco Plastics, Plaintiff operated forklifts and ran automatic scales. (*Id.*). Plaintiff was on her feet all day and also was required to lift and bend often because she had to "run wire ties and brackets and you were doing a lot of bending and lifting and moving." (*Id.*).

A normal day for Plaintiff consists of getting out of bed around 5:00a.m. (Tr. 394). However, Plaintiff testified she occasionally gets up earlier or later depending on how her night went because she does not sleep very well. (*Id.*). The reason for her poor sleep is because Plaintiff testified she has dreams of her past. (Tr. 395). After waking up, Plaintiff normally goes to the kitchen and gets a cup of coffee, usually made by Plaintiff's husband who leaves for work at 4:00a.m, and then she sits on the couch. (*Id.*). Plaintiff testified she then normally watches craft shows on television. (*Id.*). When asked if she does crafts, Plaintiff responded that she tries but she has a hard time finishing projects she started. (Tr. 396). After watching televison for a couple of hours, Plaintiff stated she then checks her email on her computer, but she does not "surf" the internet because she does not know how.[1] (*Id.*). Plaintiff's husband usually gets home from work around 2:30 or 3:00 and at that point, Plaintiff testified she usually follows him around the house and the

---

[1] Plaintiff later testified that she does not know how to use the computer at all. In fact, when asked, Plaintiff likened the computer to a piece of furniture that things get stacked on. Allegedly, Plaintiff's husband knows how to use the computer and has not shown Plaintiff. (Tr. 413).

4

yard trying to help whenever she can. For example, Plaintiff stated she follows her husband outside to do yard work but she does not participate in any of the work. (Tr. 397). Plaintiff drives once every three or four weeks to visit friends. Plaintiff grocery shops with her daughter and carries groceries with her right arm.

Many of the things Plaintiff used to do Plaintiff no longer does. For example, Plaintiff testified she used to shop for clothes but no longer does because "nothing interests" her. (*Id.*). Additionally, Plaintiff used to decorate, paint pictures and fill out the crossword puzzles in the newspaper but no longer does any of those activities. (Tr. 398). Plaintiff no longer even decorates her house for holidays but instead has a friend come over and put up holiday decorations. (Tr. 399).

In terms of pain, Plaintiff testified she can sit for about an hour before her tailbone starts to bother her. (Tr. 400). She can stand for about thirty minutes before her feet start to swell and get painful. Plaintiff has shortness of breath when she walks (usually after walking about two hundred feet) and has panic attacks when around too many people. (Tr. 401). With regards to lifting, Plaintiff stated she can lift with her arms items that are in front of her but she cannot bend over to pick anything up because extending her left arm too far causes pain. (*Id.*). Plaintiff's right arm is pain free. (Tr. 402).

Medical Expert, Dr. Gerald Hoffman, a psychiatrist, appeared before the ALJ during Plaintiff's December 2001 hearing. (Tr. 415). Dr. Hoffman asked questions of Plaintiff regarding her anxiety. (Tr. 416). Specifically, Dr. Hoffman asked Plaintiff about her feelings of anxiety and whether these feelings were the same or similar in nature. Plaintiff responded that ten years prior to her hearing, she would throw up, change color, get shaky and get diarrhea when she got anxious. (Tr. 419). For four months prior to her hearing, Plaintiff testified that the nature of the anxiety

attacks had been the same but the frequency had changed – they got more frequent. (*Id.*).

Plaintiff's anxiety attacks generally occur around noon and 4:00p.m. They usually come on when Plaintiff is in situations she cannot control. (Tr. 424). Plaintiff described a feeling of uselessness when asked to describe how she feels before the attacks occur. (*Id.*). To combat these attacks, Plaintiff testified she takes Xanax and Paxil first thing in the morning when she wakes up. (Tr. 425). Plaintiff takes her second Xanax around 1:00p.m and her third Xanax around 4:00 p.m or 5:00 p.m., usually when feelings of anxiety appear. (*Id.*). Plaintiff testified that her anxiety symptoms get better with the medication but do not completely go away. (Tr. 426). Before bed, Plaintiff takes her fourth Xanax and three Tylenol P.M. (Tr. 427).

When asked by the ALJ whether a medically-determinable mental impairment was present, Dr. Hoffman responded that Plaintiff appears to suffer from an anxiety-related disorder. (Tr. 431). With regards to a 12.06 analysis, Dr. Hoffman stated:

> there's motor tension and there's autonomic hyperactivity. I don't get any sense of apprehensive expectation and no vigilance or scanning. There's no phobic element here. [Plaintiff] has episodes which one might say she's described them as panic. I accept that; however, there is not intense and apprehension, there's no terror, there's no impending doom. There's no recollection of traumatic experience. So I would say that the A and B, you know, or whatever – or the A criteria, I can't really say that there is. ... I think it is, however, interesting that she describes a certain day periodically which reminds me at least of the possibility that she's having withdrawal, Xanax withdrawal, okay. Xanax is a short-acting anti-anxiety medication. It lasts about four hours. Usually people dose chase, okay. And it sounds ... that she was dose chasing because she experienced the onset of symptoms about four hours after she'd had the previous dose . ... So I would say that she had an anxiety disorder, I believe she has a readjustment disorder with anxious mood, okay, plus whatever might be created ... by medication.

(Tr. 432-433). When asked about her restrictions, Dr. Hoffman stated "I don't think there is

6

marked restrictions and I don't think there's marked social functioning. It's not marked. It could be — at the moderate category." (Tr. 434). With regards to her mental residual functional capacity, Dr. Hoffman stated he would limit Plaintiff to simple tasks and simple mental processes. (Tr. 435). Additionally, based on the fact that Plaintiff handled his questions well in front of everybody, Dr. Hoffman found no reason to limit Plaintiff's contact with the public. (*Id.*).

Vocational Expert, Christopher Yep, appeared before the ALJ during Plaintiff's December 2001 hearing. (Tr. 445). Mr. Yep first testified that Plaintiff's prior work would be unskilled with an exertion level ranging between light and medium (*Id.*). The ALJ then asked Mr. Yep to assume the following:

> Taking someone of [Plaintiff's] age which has ranged from 49 to 51 during this period, eight years of education, but functionally illiterate, work experience as described who can lift 20 pounds occasionally and ten pounds frequently, sit, stand, or walk as required, cannot perform repetitive overhead reach with her left non-dominant arm, cannot perform complex or detailed tasks or tasks that require extended concentration.

(Tr. 446). Based on the above, Mr. Yep stated that such an individual could not perform her past work because of the "loud environment." (*Id.*). However, such an individual could perform work as a housekeeper (30,500 jobs in the State of Illinois); inspection (24,457 jobs in the State of Illinois); and packaging (44,743 jobs in the State of Illinois). (*Id.*). The ALJ next asked Mr. Yep to further assume a limitation of "no repetitive overhead reach with [the] non-dominant arm." (*Id.*). Based on the further limitation, Mr. Yep stated such a limitation "would not have a significant impact." (*Id.*). The ALJ asked Mr. Yep to further assume that the hypothetical person "can only sit for an hour at a time and stand for 30 minutes at a time and walk short distances, ... ." (Tr. 447). Based on these further limitations, Mr. Yep testified that such limitations would "eliminate the

housekeeping job. It's also going to eliminate the packaging jobs that one has to be on individual's feet. It would allow for 40 percent of the original inspecting jobs." (*Id.*). Finally, the ALJ asked Mr. Yep what would be the result if he were to add that the individual felt ill one or two times everyday of the week. Mr. Yep stated such a person could not work. (*Id.*).

## III.   **MEDICAL HISTORY**

Plaintiff saw Dr. Isaac H. Trejo on May 19, 1996. (Tr. 115). Dr. Trejo reported Plaintiff has a history of hearing loss of several years duration and has worn a hearing aid since 1994. (*Id.*). Dr. Trejo's examination revealed Plaintiff had purulent material in her right ear canal and a deformation of her tympanic membrane. (*Id.*). The left ear had a ventilating tube in place. (*Id.*). Dr. Trejo also reported Plaintiff has significant hearing impairment due to nerve damage, as well as conductive loss in the right ear due to chronic infection. (*Id.*).

For many years, starting on what appears to be August 29, 1996, Plaintiff frequented SwedishAmerican Hospital. On August 29, 1996, Plaintiff was hospitalized for nausea, vomiting, dizziness, and anxiety. (Tr. 332). The report gave some indication that Plaintiff's symptoms may have been related to her late husband's terminal illness. (*Id.*). While Plaintiff did not experience dizziness, an examination revealed Plaintiff suffered from Vertigo, anxiety, gastroesophageal reflux disease ("GERD"), ventral hernias, and obesity. (*Id.*). Plaintiff returned to SwedishAmerican Hospital on October 11, 1996. (Tr. 333). At that time, Plaintiff indicated her ventral hernias were increasing in size but that her GERD and anxiety were fairly well controlled. (*Id.*). On October 24, 1996, Dr. Kent Hess, Internal Medicine, of the SwedishAmerican Medical Group, wrote a letter to

Riverview[2] concerning Plaintiff. In his letter, Dr. Hess wrote that Plaintiff "has anxiety with panic attacks." (Tr. 237). Dr. Hess also wrote that whenever Plaintiff is exposed to stress, she has panic attacks and will probably need to be on medication the rest of her life. (*Id.*). Dr. Hess also wrote "I do not believe [Plaintiff] will be able to function in essentially any kind of job because the anxiety and panic would worsen under any type of pressure." (*Id.*). Plaintiff continued to suffer from GERD, panic attacks, and anxiety and continued to see various doctors at SwedishAmerican Hospital.

An MRI of Plaintiff's left shoulder was taken on January 27, 2000 at SwedishAmerican Hospital's Department of Medical Imaging. (Tr. 112). Dr. Stephen A. Bernstein reported that the MRI revealed an abnormal linear signal seen along the articular surface of the supraspinatus tendon which increases on the T2-weighted images, consistent with small articular surface supraspinatus tendon tear just proximal to its insertion into the greater tuberosity. (*Id.*). Additionally, hypertrophic changes involving the left acromioclavicular joint were noted. (*Id.*). In summary, Dr. Bernstein reported Plaintiff suffered from: 1) supraspinatus articular surface tendon tear with intact bursal surface; and 2) significant hypertrophic changes involving the left acromioclavicular joint which narrow the osseous outlet. (*Id.*).

On March 3, 2000, Dr. Scott White, of Camelot Radiology Associates, Ltd., performed a cervical spine x-ray on Plaintiff. (Tr. 113). The x-ray revealed mild spurring at C5-6. (*Id.*). No abnormal soft tissue swelling was noted and intervertebral disk heights were maintained. (*Id.*).

Plaintiff experienced chest pain in early April 2000. (Tr. 121). Specifically, on April 5,

---

[2] It is unclear to this court what type of entity Riverview is or why Dr. Hess would write Riverview.

2000, Plaintiff saw Dr. Joon Chang of Saint Anthony Medical Center for atypical chest discomfort. (*Id*.). Dr. Chang reported that Plaintiff's baseline electrocardiographic examination revealed normal sinus with nonspecific changes. Dr. Chang did report Plaintiff complained of marked burning sensations in her chest during the examination. (*Id*.). Ultimately, Dr. Chang found Plaintiff's electrocardiographic response to persantine infusion normal, although a chest burning sensation was noted. (*Id*.).

On August 4, 1999, Dr. Eric J. Hess, of SwedishAmerican Medical Group, saw Plaintiff. Dr. Hess reported Plaintiff was suffering from acute onset of numbness in her right hand, arms and lips. (Tr. 345). Additionally, Plaintiff reported her fingers and nails became discolored during these episodes of numbness. (*Id*.). Dr. Hess' objective observation of Plaintiff was that she had high blood pressure and appeared moderately anxious. (*Id*.). Dr. Hess' assessment of Plaintiff was that she was suffering from anxiety with probable hyperventilation symptoms. (*Id*.). Dr. Hess continued Plaintiff on Serzone.

On April 28, 2000, Plaintiff had shoulder surgery on her left shoulder. Specifically, Dr. Andreas Fischer, of Saint Anthony Medical Center, performed a left shoulder acromioplasty and distal clavicle resection with rotator cuff exploration. (Tr. 197). Dr. Fischer removed an anterior bony spur and increased the subcranial space. (*Id*.). Next, Dr. Fischer resected the distal clavicle 1cm from the joint. (*Id*.). Once the distal clavicle was resected, Dr. Fischer performed an across body adduction to insure no bony impingement. (*Id*.). Excessive bursal tissue was excised and the entire rotator cuff was inspected with no obvious tears noted. (*Id*.). A follow-up report by Dr. Fischer on May 19, 2000, indicated that while Plaintiff's surgery was successful and without complication, Plaintiff had significant amounts of nausea and emesis postoperative. (Tr. 157). By

June 27, 2000, Plaintiff reported feeling better in her left shoulder although she had made "less than optimal progress in terms of regaining range of motion." (Tr. 195).

In late June 2000, Plaintiff's left leg started to bother her. On June 27, 2000, Plaintiff saw Dr. Jeffrey Barteau who reported that Plaintiff's lower extremity venous doppler examination demonstrated normal spontaneous flow with normal respiratory phasicity and augmentation. (Tr. 166). A duplex image in the longitudinal and transverse projections bilaterally demonstrated no intraluminal filling defects. Overall, Dr. Barteau found no evidence of deep vein thrombosis. (*Id.*).

Plaintiff's left shoulder continued to heal three months after surgery, although her range of motion continued to be limited. (Tr. 196). On July 31, 2000, Dr. Fischer reported that while some improved function was noted in Plaintiff's left shoulder, a physical examination revealed Plaintiff had a restricted range of motion in both an active and passive sense. (*Id.*). Plaintiff's forward elevation and abduction was only 90 degrees while her external rotation was 45 degrees. (*Id.*). Dr. Fischer suggested to Plaintiff that she might be suffering from "an adhesive or frozen shoulder." (*Id.*). By August 7, 2000, due to her minimal progress in regaining her range of motion, Plaintiff stopped all physical therapy. (Tr. 186).

Plaintiff filled out an Activities of Daily Living Questionnaire on August 24, 2000. (Tr. 88). Plaintiff indicated that she usually does the cleaning, dusting, laundry and ironing in the house but not the vacuuming because she cannot perform the repeated back and forth movement needed to vacuum. (*Id.*). Plaintiff also indicated that she cannot lift heavy items or move her left arm above shoulder to reach for items. (*Id.*). Also, as of August 24, 2000, Plaintiff indicated she was taking Serzone (200mg), Prilosec (40mg a day), Vitamin B12 (1,000 mg a day), Premarine (.0625 mg once a day), Diazepan (2mg as needed) and a daily vitamin. (*Id.*). In terms of activities, Plaintiff

indicated that she often drives her car, watches televison, and talks on the phone. (Tr. 90). Plaintiff sometimes goes to church, talks to neighbors, pays bills, and goes out to eat. (*Id.*). Plaintiff rarely or never reads, watches children, fixes things, plays cards, performs hobbies, goes to sports events, volunteers, goes to movies, or goes to classes. (*Id.*).

Plaintiff's range of motion continued to be limited throughout Plaintiff's slow recovery from shoulder surgery. On September 14, 2000, five months after her surgery, Dr. Fischer reported Plaintiff had continued stiffness and inability to abduct her arm over 90 degrees. (Tr. 244). Dr. Fischer's physical examination revealed Plaintiff can only actively abduct to just under 90 degrees with forward elevation approximately 100 degrees. By November 13, 2000, seven months after her surgery, Plaintiff noted some improvement in her shoulder function with her forward elevation improving to approximately 130 degrees. (*Id.*). However, Plaintiff's external rotation remained at approximately 50 degrees with the arm at the side and internal rotation at nearly 90 degrees. (*Id.*). By February 12, 2001, Plaintiff started feeling better. (Tr. 245). Dr. Fischer's physical examination revealed some improvement in her shoulder elevation to nearly 160 degrees. (*Id.*).

On September 20, 2000, Dr. William N. Hilger, a Licensed Clinical Psychologist, wrote a psychological evaluation of Plaintiff for the Bureau of Disability Determination Services. (Tr. 199). Initially, Dr. Hilger reported Plaintiff appeared to be a neat, clean, casually dressed, nicely groomed and very obese woman. (*Id.*). Plaintiff spoke clearly and fluently and was pleasant, attentive and cooperative but tended to respond slowly to questions. (*Id.*). With regards to Plaintiff's immediate memory, Dr. Hilger reported Plaintiff could recall through four digits forwards and three digits backwards. (Tr. 201). Plaintiff was able to name the current U.S. President but could not recall the prior President. (*Id.*). In terms of her general knowledge, Plaintiff knew the number of months in

a year but thought there were fifty-three weeks in a year. (*Id.*). Plaintiff could add single digit numbers and could do some simply multiplication. (*Id.*). Dr. Hilger found Plaintiff's conceptual reasoning, abstract reasoning, and judgment to be sound. (*Id.*). Ultimately, Dr. Hilger's impressions of Plaintiff were: Axis I – agoraphobia with panic attacks, fairly controlled with medication; Axis II – low average intelligence with possible personality disorder with dependent features; and Axis III – left arm condition with a bilateral hearing disorder. (Tr. 202). While Dr. Hilger noted Plaintiff's questionable mental potential inhibits her ability to perform work related activities involving understanding, memory, concentration, persistence, social interaction and adaption, Dr. Hilger did report that once Plaintiff's arm improves, "she would be able to resume performing work that would necessitate the use of her arm, as in lifting and moving things." (*Id.*).

A Psychiatric Review Technique Form was filled out by D.G. Hudspeth, Psy.D., a Disability Determination Services physician, on October 15, 2000. (Tr. 204). Dr. Hudspeth's medical disposition was that Plaintiff's anxiety-related disorder (12.06) impairments were not severe. (*Id.*). With regards to Plaintiff's functional limitations and the degree of those limitations, Dr. Hudspeth reported Plaintiff's restriction of activities of daily living was only mildly limited as was Plaintiff's difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence or pace. (Tr. 214). Dr. Hudspeth found Plaintiff also only suffered from one or two repeated episodes of decompensation. (*Id.*).

A Residual Functional Capacity Assessment Form was filed out by Dr. Towfig Arjmand, and affirmed later by Dr. George Andrews, on October 19, 2000. (Tr. 220-227). Dr Arjmand reported Plaintiff can occasionally lift twenty pounds and frequently lift ten pounds. (Tr. 221). Plaintiff can stand and/or walk for about six hours in an eight hour workday, sit for about six hours in an eight

hour workday and push and/or pull a limited amount of weight with her upper extremities. (*Id.*). Dr. Arjmand also reported Plaintiff can occasionally climb stairs but can frequently balance, stoop, kneel, crouch and crawl. (Tr. 222). Plaintiff has a manipulative limitation in that she is limited in her ability to reach with her left arm but Plaintiff has no visual, communicative or environmental limitations (except that Dr. Arjmand reported Plaintiff should avoid concentrated exposure to heights). (Tr. 224). Based on the above limitations, a Report of Contact was filed (signed by a D. Tiffany) which indicated Plaintiff could perform the following jobs: Page (radio and TV broadcasting); Furniture Rental Consultant (retail trades); and Investigator, Dealer Accounts (financial). (Tr. 93).

Dr. Fischer, Plaintiff's treating physician, filled out a Physical Capacities Evaluation Form for Plaintiff on January 10, 2001. (Tr. 249). On the form, Dr. Fischer indicated that in an eight hour workday Plaintiff can sit, stand, walk and/or drive for eight hours. (*Id.*). Additionally, Dr. Fischer indicated Plaintiff can constantly lift one to ten pounds, frequently lift eleven to twenty pounds and never lift anything over twenty-one pounds. (*Id.*). Further, Dr. Fischer indicated Plaintiff can never climb or balance, occasionally stoop, kneel, crouch, crawl and reach and constantly handle, finger and feel. (*Id.*). Lastly, Dr. Fischer indicated Plaintiff can perform light work with a restriction that Plaintiff not use her left arm for any overhead use. (Tr. 250).

Dr. Fischer saw Plaintiff again on February 12, 2001. (Tr. 247). After seeing Plaintiff, Dr. Fischer wrote a letter to Doctor Maloney, Plaintiff's general physician. (*Id.*). In his letter, Dr. Fischer indicated Plaintiff experienced no discomfort in her shoulder except for some lateral neck discomfort after a recent fall. (*Id.*). Plaintiff complained of left thumb pain which Plaintiff attributed to arthritis. (*Id.*). A physical examination revealed improved range of motion in Plaintiff's left

shoulder to 160 degrees. (*Id.*).

On December 19, 2001, Dr. Maloney, after treating Plaintiff for anxiety and panic attacks, indicated he was referring Plaintiff to a psychiatrist for further evaluation of her anxiety and panic attacks. (Tr. 326). Plaintiff apparently started seeing Dr. Jonathan Bloomberg of Rockford Health System in Rockford Memorial Hospital's mental health building. (Tr. 361). This court states apparently because there do not appear to be any medical records from Dr. Bloomberg. The only thing available to this court is a letter Dr. Bloomberg wrote to Mr. Greg Tuite, Plaintiff's attorney. In his letter, Dr. Bloomberg indicated he believed Plaintiff suffered from major depression as well as panic disorder. (*Id.*). At the time of the letter, Dr. Bloomberg indicated Plaintiff was having panic attacks two or three times a week. (*Id.*). Additionally, Plaintiff displayed symptoms of agitation, sadness and irritability, which Dr. Bloomberg wrote "reflect major depression as well." (*Id.*). Dr. Bloomberg started Plaintiff on Paxil and subsequently Zoloft because the Paxil did not seem to work. (*Id.*).

## IV. **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its judgment for that of the [ALJ]." *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision rests with the

Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. §405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000); *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalala*, 998 F.2d 473, 487 (7th Cir. 1993). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ's decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

## V. FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(3)(A). A physical or

mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[3] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[4] A severe impairment is one which significantly limits the claimant's physical or

---

[3]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

[4]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For

mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467, 470-71 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain

_____

syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.   ANALYSIS

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on May 30, 2002. (Tr. 14). Specifically, the ALJ found that Plaintiff "has not engaged in work activity since her alleged onset date." (*Id.*).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the

claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found Plaintiff suffered from: a history of rotator cuff tear of the left shoulder status post repair; macromastia; an anxiety disorder; major depression; GERD; and hearing loss bilaterally. (*Id.*).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.      Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 14). The ALJ found, in one sentence, that Plaintiff's "impairments do not satisfy the requirements of any section of the Listings even when considered in combination." (*Id.*). On what seems like now numerous occasions, this court again states that it has some concerns with the lack of depth and discussion it has seen at Step Three in recent opinions.

20

As this court has seen on numerous occasions, the ALJ failed to discuss, or even cite, the relevant Listing. Depending on the circuit, this omission alone would dictate remand. *Compare Burnett v. Commissioner*, 220 F.3d 112, 119-20 (3d Cir. 2000)(remanding where the ALJ "'merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairments,' without identifying the relevant listed impairments, discussing the evidence, or explaining his reasoning.")(*citing Clifton v. Chater*, 79 F.3d 1007, 1009)(10th Cir. 1996)), *with Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999)(holding that the conclusory form of the ALJ's decision alone does not justify remand). However, the Seventh Circuit has not decided whether failing to discuss or even cite a Listing at step three justifies remand. *See Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)(stating the Seventh Circuit need not address the tension between the circuits as to whether a conclusory statement at Step Three is fatal because the ALJ's decision could not stand even if she cited the correct rule). Even though the Seventh Circuit has not provided guidance on this issue, principles of administrative law require the ALJ to rationally articulate the grounds for his/her decisions thereby building "an accurate and logical bridge from the evidence ... ." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This then allows the court to confine review to the reasons supplied by the ALJ. *See Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

The question then remains whether this court should remand because of the ALJ's failure to cite the listing or whether this court should determine whether remand is necessary given the medical record. The problem with the latter is that it necessitates that this court weigh evidence when that is not its role in this process. However, because the findings at Step Three are so conclusory, it is difficult to ascertain the process of this ALJ. Therefore, for the sake of judicial efficiency, this court

adopted a standard to handle conclusory Step Three analyses. *See Pazera v. Barnhart*, 2003 U.S.

Dist. LEXIS 23121 (N.D. Ill. Dec. 23, 2003). That standard is whether a reasonable ALJ could find

that Plaintiff's impairments meet or medically equal an impairment in the listings. *Id.* at *35.

Listing 12.06 states

> Anxiety Related Disorders: In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.
>
> A.   Medically documents findings of at least one of the following:
>
>     1.   Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
>
>         a.   Motor tension; or
>
>         b.   Autonomic hyperactivity; or
>
>         c.   Apprehensive expectation; or
>
>         d.   Vigilance and scanning; or
>
>     2.   A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
>
>     3.   Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
>
>     4.   Recurrent obsessions or compulsions which are a source of marked distress; or
>
>     5.   Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress: AND
>
> B.   Resulting in at least two of the following:
>
>     1.   Marked restriction of activities of daily living; or
>
>     2.   Marked difficulties in maintaining social functioning; or
>
>     3.   Marked difficulties in maintaining concentration, persistence, or pace; or
>
>     4.   Repeated episodes of decompression each of extended

duration. OR

C.    Resulting in complete inability to function independently outside the area of one's home.

In order to proceed efficiently, this court will jump to Section B of Listing 12.06. Listing 12.06 requires a finding of at least two areas of marked limitation with restrictions on activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, or repeated episodes of decompression. The medical record indicates that Plaintiff cannot fulfill the requirements of Section B in Listing 12.06. Neither her treating physician nor a non-treating physician found Plaintiff to have marked limitations as required in Section B. Additionally, it does not appear Plaintiff can fulfill Section C of 12.06 because Plaintiff can function independently outside of her home. Therefore, this court finds that no reasonable ALJ could find that Plaintiff is disabled under Listing 12.06 at Step Three.

Additionally, with regards to Plaintiff's shoulder, after reviewing the medical record, it does not appear that Plaintiff satisfies any of the requirements under Listing 1.00 (*Musculoskeletal System*). Specifically, Plaintiff does not satisfy Listing 1.03 (*Arthritis of a major weight-bearing joint*) because Plaintiff does not have signs of marked limitation of motion in her left shoulder. Rather, Plaintiff can use her left arm but not to perform any overhead actions. Additionally, Plaintiff does not satisfy Listing 1.04 (*Arthritis of one major joint in each of the upper extremities*) because Plaintiff's right arm is unencumbered. Additionally, Plaintiff does not appear to satisfy Listing 2.00(B)(1) (*Hearing Impairment*) because Plaintiff's medical record does not contain the necessary testing information needed to determine if Plaintiff's hearing impairment satisfies Step Three. Therefore, after reviewing the medical record, this court finds that no reasonable ALJ could find that Plaintiff is disabled under Step Three.

Substantial evidence exists to support the ALJ's limited finding and the court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D.      Step Four:  Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is unable to perform any of her past relevant work. Before doing so, the ALJ determined Plaintiff's RFC. In determining a mental RFC, the first step in the procedure is to assess the nature and extent of the Plaintiff's mental limitations and restrictions (20 C.F.R. § 416.945 (c)). This information is then used to determine the Mental RFC. In order to properly assess an individual's level of functioning due to a mental disorder, evaluation of the impairment must take into account the severity of the impairment over a period of time.(20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1 12.00 (d)). This information is then used to complete Plaintiff's vocational assessment. After considering the entire record, the ALJ found Plaintiff's RFC to include the following:

> lift and/or carry no more than 20 pounds occasionally or 10 pounds frequently in a job that does not require repetitive overhead reach with her left, non-dominant arm; not work in a loud environment; not balance or climb; and not perform detailed or complex tasks or tasks [sic] that require extended concentration.

(Tr. 20). With the above limitations, the ALJ found Plaintiff's past relevant work as a factory worker to be unskilled work that required light to medium exertion. Under the RFC determined by the ALJ, the ALJ found Plaintiff "cannot return to any past relevant work given her non-exertional limitations." (Tr. 18). The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step Four of the Analysis is affirmed.

E. Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

At Step Five the ALJ determined that although Plaintiff's RFC did not allow her to perform the full range of light work, Plaintiff is capable of performing a significant range of light work. (Tr. 19). According to the ALJ, if Plaintiff were able to perform the full range of light work, a finding of "not disabled" would be directed by Rule 202.10. However, Plaintiff's ability to perform a full range of light work is impeded by additional exertional and/or non-exertional limitations. (*Id.*). Appropriately, the ALJ consulted a vocational expert. The vocational expert determined that a person with Plaintiff's limitations can perform the following jobs: housekeeper, inspector and packager. (*Id.*). Therefore, the ALJ found Plaintiff not disabled.

After reviewing Plaintiff's medical record and the ALJ's opinion, this court finds substantial evidence to support the ALJ. While there appears to be some conflict between Plaintiff's treating psychiatrist, Dr. Bloomberg, and Dr. Hoffman, the medical consultant called by the ALJ (also a psychiatrist) and other non-treating physicians, this conflict does not tip the scales in favor of Plaintiff.[5] Dr. Bloomberg's two paragraph letter says nothing about Plaintiff's mental limitations

---

[5]There appears to be some conflict in the Seventh Circuit on the weight a treating physician should receive in determining whether an individual is disabled or not. *Compare Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)(stating "the ALJ properly noted that more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances."); *Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000)(stating "A physician's opinion regarding the nature of severity of an impairment will be given controlling weight if it is well supported by the medically acceptable ... techniques."), *with Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 917 (7th Cir. 2003)(stating "physicians naturally tend to support their patients' disability claims, and so we have warned against 'the biases that a treating physician may bring to the disability evaluation.'")(citing *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)); *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)(explaining that "the patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find

or whether Plaintiff has the ability to work. Rather, Dr. Bloomberg's letter only states that he believes Plaintiff has major depression as well as panic attacks. Dr. Hilger, who saw Plaintiff, acknowledged that she has panic attacks and is depressed, but opined that Plaintiff could resume performing work once her left arm improved. Additionally, Dr. Hudspeth found Plaintiff suffered from panic attacks but reported that these attacks only caused a mild limitation on her activities of daily living, maintaining social functioning and maintaining concentration, persistence and pace. (Tr. 214). Lastly, Dr. Hoffman, after listening to Plaintiff testify, stated that Plaintiff's panic attacks are not intense (in that there is no terror or impending doom associated with them); but rather, Plaintiff may be having Xanax withdrawal due to consistent nature of her attacks occurring every four hours.[6]

Furthermore, there is no indication from either a treating or non-treating physician that the RFC determined by the ALJ is incorrect. While it is true that Plaintiff had shoulder surgery and her recovery process went slowly, it does appear Plaintiff is recovering and can use her left shoulder as long as she does not do any overhead activity. This is supported by Plaintiff's own testimony

---

disability").

[6] As stated above, with regards to Plaintiff's Xanax withdrawal, Dr. Hoffman stated:
I think it is, however, interesting that she describes a certain day periodically which reminds me at least of the possibility that she's having withdrawal, Xanax withdrawal, okay. Xanax is a short-acting anti-anxiety medication. It lasts about four hours. Usually people dose chase, okay. And it sounds ... that she was dose chasing because she experienced the onset of symptoms about four hours after she'd had the previous dose . ... So I would say that she had an anxiety disorder, I believe she has a readjustment disorder with anxious mood, okay, plus whatever might be created ... by medication.
(Tr. 432-433).

regarding her daily activities and the reports of her treating physician, Dr. Fischer. First, in filling

out the Activities of Daily Living Questionnaire, Plaintiff indicated she usually does the cleaning,

dusting, laundry and ironing. (Tr. 88). Additionally, Plaintiff indicated she often drives her car and

sometimes goes to church, talks to neighbors or goes out to eat. (Tr. 90). Second, Plaintiff's treating

physician Dr. Fisher reported Plaintiff can sit, stand, walk and/or drive for eight hours in an eight

hour day and can constantly lift one to ten pounds, frequently lift eleven to twenty pounds and never

lift anything over twenty-one pounds. (Tr. 249). These limitations, Dr. Fischer indicated, limit

Plaintiff to light work (as found by the ALJ) with overhead reaching restrictions.

## VII.   CONCLUSION

For the above stated reasons, Plaintiff's Motion for Summary Judgment is granted in part and

denied in part. By agreement of both parties, Plaintiff's second claim is remanded. With regards

to Plaintiff's first claim, the ALJ's decision to deny benefits to Plaintiff is sustained and the ALJ is

affirmed at all steps of the disability determination process as outlined above. Defendant's Motion

for Summary Judgment is granted in part and denied in part.


**ENTER:**

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT


DATE: 5/20/04